**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

JUDEL NOEL,              :

                         :     Civil Action No. 04-3986 (WHW)

         Petitioner,   :

                         :

         v.            :     **OPINION**

                         :

ROY L. HENDRICKS, et al.,   :

                         :

         Respondents.  :

**APPEARANCES:**

Petitioner pro se
Judel Noel
New Jersey State Prison
P.O. Box 861
Trenton, NJ 08625

Counsel for Respondents
Deborah Bartolomey
Ofc. of New Jersey Atty. Gen.
Appellate Section
P.O. Box 086
Trenton, NJ 08625

**WALLS**, District Judge

    Petitioner Judel Noel, a prisoner currently confined at New Jersey State Prison in Trenton, New Jersey, has submitted a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The respondents are Roy L. Hendricks and the Attorney General of New Jersey.

    For the reasons stated herein, the Petition must be denied.

## I.   BACKGROUND

The relevant facts are set forth in the opinion of the Superior Court of New Jersey, Appellate Division.[1]

> The victim of this senseless, brutal and tragic killing was a young man who was shot repeatedly on his front porch as he was returning to his home on Sanford Avenue in Newark in the early evening.  There was no suggestion of any motive for the murder.  No robbery was involved and there was no evidence at all suggesting any reason for this attack on the victim. According to the police testimony, on information received, neither the source nor content of which was disclosed, the police believed there might be a suspect at a house on 43 Silver Street, close to the intersection of Sanford Avenue and Silver Street.  They went to that house in the early hours of the next morning and surrounded it with guns drawn.  As they took up their positions, a bag of cocaine was thrown out of an upstairs window.  The officers gained admission to the house and were given consent to search.  The search took them eventually to the two-room attic, on whose landing they found another bag of cocaine containing some thirty vials.  Four young people were sleeping in the attic rooms, among whom were Lamar Brown, who lived in the house, and his fifteen-year old girlfriend, Malika Williams, who frequently slept there.  The four young people were taken to police headquarters for interrogation.  Brown and Williams, in separate interviews, both said that they had witnessed the shooting and that defendant, with whom both were acquainted, was the gunman. Neither Williams nor Brown was ever charged with drug offenses.
>
> Based on the information received from Brown and Williams, the police tracked down defendant and found

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

him several hours later.  He was asleep in the pre-
parole halfway house in which he then resided. [FN1]
Defendant was awakened and placed under arrest.  A bag
containing eighteen bullets was found in his locker.
Nine of the bullets were nine-millimeter bullets
stamped with the manufacturer's name, Speers., The
police had also recovered spent bullets and bullet
casings at the crime scene.  The shell casings were
also stamped with the same manufacturer's name.
Defendant also told the police that he had a handgun in
his bed.  The police seized that weapon, which was not,
however, the murder weapon.

     FN1.  The jury, of course, was not made aware
     of the nature of that communal residence.

     [T]he State's proofs consisted entirely of the two
eyewitness identifications and defendant's possession
of nine-millimeter Speers bullets.  There was no
evidence linking defendant in any way with the victim
prior to the shooting.  With respect to the eyewitness
identifications, we point out first that Brown had
recanted, asserting at trial that he had identified
defendant as the gunman at the police station both
because he had been beaten by the police and had been
threatened with drug charges.  He testified that he had
not even been in Newark on the day of the shooting but
had been visiting a friend in another city.  His prior
inconsistent statement identifying defendant was
admitted pursuant to N.J.R.E. 803(a)(1) following a
hearing as mandated by State v. Gross, 121 N.J. 18, 577
A.2d 814 (1990).

     Malika Williams, Brown's girlfriend, testified
that she had spent most of the day "hanging out" at a
store at the corner of Sanford Avenue and Silver Street
with a group of other young people, including her
boyfriend Brown, whom she claimed to be a drug dealer
operating at the corner.  She had seen defendant in the
area during the latter part of the afternoon, and, in
fact, had gone into the house at 43 Silver Street to
make two telephone calls for him at his request,
reporting to him that there had been no answer.  Not
long after the second telephone call and after she had
returned to the corner, she heard the sound of
shooting.  Although all the other people at the corner
ran away, she ran into the middle of the street to see
what was happening.  She saw the gunman shooting the

victim and then running away past her.  She testified
that although the gunman was masked, the mask slipped
down as he ran past her and she was able to identify
him as the defendant.  The police conceded that none of
the other young people who had been standing at the
corner had been interviewed regarding the shooting
although Williams had given them the names of a number
of them.  One of them testified for the defense,
asserting that she too had been at the corner, heard
the shooting, and ran away.  She also testified that
she had seen Williams and another young woman leave the
corner prior to the shooting and asserted that Williams
was not present when the shooting took place.  Finally,
this defense witness further testified that Williams
had admitted to her that she, Williams, had lied in
making her identification of defendant and that the
identification was false.

   Thus, with respect to the eyewitnesses, both of
whom were found in the house where a suspect was
believed to be and both of whom were evidently involved
with drugs, one recanted and the testimony of the other
was contradicted by an apparently disinterested
witness.

State v. Noel, 303 N.J. Super. 435, 439-41 (1997).

Following a jury trial, Petitioner was convicted in the

Superior Court, Law Division, of Essex County, of first degree

purposeful or knowing murder, N.J.S.A. 2C:11-3a(1) and (2), third

degree possession of a handgun without a permit, N.J.S.A. 2C:39-

5b, and third degree possession of a .380 caliber handgun without

a permit, N.J.S.A. 2C:39-5b.  After the jury verdict was

returned, Petitioner pleaded guilty to a severed fourth count of

the indictment charging possession of another handgun and to the

severed fifth county of the indictment charging the unlawful

possession of hollow nose bullets.  The trial court sentenced him

to an aggregate term of life, with a 30-year parole disqualifier.

4

On direct appeal, the Appellate Division reversed the conviction and remanded for a new trial. State v. Noel, 303 N.J. Super. 435 (App. Div. 1997). The State appealed,[2] and on February 10, 1999, the Supreme Court of New Jersey reversed the Appellate Division and reinstated the conviction. State v. Noel, 157 N.J. 141 (1999).

Petitioner filed his state court petition for post-conviction relief on December 15, 1999. After a non-evidentiary hearing, the trial court denied relief. The Appellate Division affirmed the denial of relief and, on June 30, 2004, the Supreme Court of New Jersey denied certification.

This Petition, dated August 17, 2004, followed. Respondents have answered, and this matter is now ready for disposition.

## II.   28 U.S.C. § 2254

As amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254 now provides, in pertinent part:

> (a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

---

[2] Petitioner also filed a petition for certification, directed to the issues raised on direct appeal that were summarily found to be without merit. On November 18, 1997, the Supreme Court of New Jersey denied certification. (RE10 at 4; State v. Noel, 152 N.J. 190 (1997).)

5

With respect to any claim adjudicated on the merits in state court proceedings, the writ shall not issue unless the adjudication of the claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "if the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] Court and nevertheless arrives at a result different from [the Court's] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000) (O'Connor, J., for the Court, Part II). A state court decision "involve[s] an unreasonable application" of federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," and may involve an "unreasonable application" of federal law "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context

6

where it should apply," (although the Supreme Court expressly declined to decide the latter). Id. at 407-09. To be an "unreasonable application" of clearly established federal law, the state court's application must be objectively unreasonable. Id. at 409. In determining whether the state court's application of Supreme Court precedent was objectively unreasonable, a habeas court may consider the decisions of inferior federal courts. Matteo v. Superintendent, 171 F.3d 877, 890 (3d Cir. 1999).

Even a summary adjudication by the state court on the merits of a claim is entitled to § 2254(d) deference. Chadwick v. Janecka, 302 F.3d 107, 116 (3d Cir. 2002) (citing Weeks v. Angelone, 528 U.S. 225, 237 (2000)). With respect to claims presented to, but unadjudicated by, the state courts, however, a federal court may exercise pre-AEDPA independent judgment. See Hameen v. State of Delaware, 212 F.3d 226, 248 (3d Cir. 2000), cert. denied, 532 U.S. 924 (2001); Purnell v. Hendricks, 2000 WL 1523144, *6 n.4 (D.N.J. 2000). See also Schoenberger v. Russell, 290 F.3d 831, 842 (6th Cir. 2002) (Moore, J., concurring) (and cases discussed therein).

The deference required by § 2254(d) applies without regard to whether the state court cites to Supreme Court or other federal caselaw, "as long as the reasoning of the state court does not contradict relevant Supreme Court precedent." Priester v. Vaughn, 382 F.3d 394, 398 (3d Cir. 2004) (citing Early v.

7

Packer, 537 U.S. 3 (2002); Woodford v. Visciotti, 537 U.S. 19 (2002)).

Although a petition for writ of habeas corpus may not be granted if the Petitioner has failed to exhaust his remedies in state court, a petition may be denied on the merits notwithstanding the petitioner's failure to exhaust his state court remedies.   See 28 U.S.C. § 2254(b)(2); Lambert v. Blackwell, 387 F.3d 210, 260 n.42 (3d Cir. 2004); Lewis v. Pinchak, 348 F.3d 355, 357 (3d Cir. 2003).

Finally, a pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers.   Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520 (1972).   A pro se habeas petition and any supporting submissions must be construed liberally and with a measure of tolerance.   See Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998); Lewis v. Attorney General, 878 F.2d 714, 721-22 (3d Cir. 1989); United States v. Brierley, 414 F.2d 552, 555 (3d Cir. 1969), cert. denied, 399 U.S. 912 (1970).]

### III.   ANALYSIS

### A.   Timeliness

Respondents assert that the Petition is untimely.

The limitation period for a § 2254 habeas petition is set forth in 28 U.S.C. § 2244(d), which provides in pertinent part:

> (1) A 1-year period of limitations shall apply to an application for a writ of habeas corpus by a person in

custody pursuant to the judgment of a State court.   The
limitation period shall run from the latest of--

    (A) the date on which the judgment became final by
the conclusion of direct review or the expiration of
the time for seeking such review; ...

(2) The time during which a properly filed application
for State post-conviction or other collateral review
with respect to the pertinent judgment or claim is
pending shall not be counted toward any period of
limitation under this section.

Thus, evaluation of the timeliness of a § 2254 petition requires

a determination of, first, when the pertinent judgment became

"final," and, second, the period of time during which an

application for state post-conviction relief was "properly filed"

and "pending."

    A state-court criminal judgment becomes "final" within the

meaning of § 2244(d)(1) by the conclusion of direct review or by

the expiration of time for seeking such review, including the 90-

day period for filing a petition for writ of certiorari in the

United States Supreme Court.   See Swartz v. Meyers, 204 F.3d 417,

419 (3d Cir. 2000); Morris v. Horn, 187 F.3d 333, 337 n.1 (3d

Cir. 1999); U.S. Sup. Ct. R. 13.

    Where a conviction became final prior to April 24, 1996, the

effective date of § 2244(d), a state prisoner has a one-year

grace period after that effective date to file a § 2254 petition.

Burns v. Morton, 134 F.3d 109, 111 (3d Cir. 1998).

    An application for state post-conviction relief is

considered "pending" within the meaning of § 2244(d)(2), and the

limitations period is statutorily tolled from the time it is
"properly filed," during the period between a lower state court's
decision and the filing of a notice of appeal to a higher court,
Carey v. Saffold, 122 S.Ct. 2134 (2002), and through the time in
which an appeal could be filed, even if the appeal is never
filed, Swartz v. Meyers, 204 F.3d at 420-24. However, "the time
during which a state prisoner may file a petition for writ of
certiorari in the United States Supreme Court from the denial of
his state post-conviction petition does not toll the one year
statute of limitations under 28 U.S.C. § 2244(d)(2)." Stokes v.
District Attorney of the County of Philadelphia, 247 F.3d 539,
542 (3d Cir.), cert. denied, 122 S.Ct. 364 (2001).

The limitations period of § 2244(d) is also subject to
equitable tolling. Fahy v. Horn, 240 F.3d 239, 244 (3d Cir.),
cert. denied, 122 S.Ct. 323 (2001); Jones v. Morton, 195 F.3d
153, 159 (3d Cir. 1999); Miller v. New Jersey State Dept. of
Corrections, 145 F.3d 616, 618 (3d Cir. 1998). Equitable tolling
applies

> only when the principles of equity would make the rigid
> application of a limitation period unfair. Generally,
> this will occur when the petitioner has in some
> extraordinary way been prevented from asserting his or
> her rights. The petitioner must show that he or she
> exercised reasonable diligence in investigating and
> bringing [the] claims. Mere excusable neglect is not
> sufficient.

Miller, 145 F.3d at 618-19 (citations omitted). Among other
things, the Court of Appeals for the Third Circuit has held that

equitable tolling may be appropriate "if the plaintiff has timely asserted his rights mistakenly in the wrong forum," i.e., if a petitioner has filed a timely but unexhausted federal habeas petition. Jones, 195 F.3d at 159. See also Duncan v. Walker, 533 U.S. 167, 183 (2001) (Stevens, J., joined by Souter, J., concurring in part) ("neither the Court's narrow holding [that the limitations period is not statutorily tolled during the pendency of a premature federal habeas petition], nor anything in the text or legislative history of AEDPA, precludes a federal court from deeming the limitations period tolled for such a petition as a matter of equity"); 533 U.S. at 192 (Breyer, J., dissenting, joined by Ginsburg, J.) (characterizing Justice Stevens's suggestion as "sound").

Finally, "a pro se prisoner's habeas petition is deemed filed at the moment he delivers it to prison officials for mailing to the district court." Burns v. Morton, 134 F.3d 109, 113 (3d Cir. 1999) (citing Houston v. Lack, 487 U.S. 266 (1988)).

Here, the one-year limitations period began to run on May 11, 1999, 90 days after the Supreme Court of New Jersey denied certification on February 10, 1999. After a lapse of 218 days, on December 15, 1999, Petitioner filed his state petition for post-conviction relief, at which time the limitations period became statutorily tolled because of the pending of a properly-filed state petition for post-conviction relief. The limitations

11

period remained tolled until the Supreme Court of New Jersey
denied certification as to the petition for post-conviction
relief on June 30, 2004.  At that time, 147 days were remaining
in the one-year limitations period.  The Petition for habeas
relief filed in this Court was dated August 17, 2004, only 48
days after the Supreme Court of New Jersey denied certification,
and was received on August 19, 2004.  Thus, the Petition is
timely and will be addressed on the merits.

B.    Juror Misconduct

Petitioner contends that he was deprived of his due process
rights by the trial court's refusal to conduct an individualized
voir dire after one juror told other jurors that she was afraid
to serve on the jury because she lived in the neighborhood where
the offense occurred.  Petitioner contends further that the judge
should have declared a mistrial based upon the fearful juror's
discussions with other jurors.

At the end of the second day of trial, one juror advised the
trial court that she lived near the scene of the homicide.
(2T216.)  The juror was asked whether that would affect her
ability to be impartial or would make her fearful; she was told
to "think about it" overnight.  (2T216-217.)  The next day, the
juror advised the court that she felt "threatened" by the
situation.  She advised the Court that she had discussed her
feelings with other jurors "[a] little bit."  In response to

12

questioning from counsel, she stated that she had told three or four other jurors that she felt afraid because the crime occurred in her neighborhood, but she had not said anything about Petitioner. Both counsel agreed to excusing her. (3T3-8.) Defense counsel asked to voir dire the jurors to whom the disqualified juror had spoke. Based on the stated nature and source of the disqualified juror's fear, and the limited nature of her remarks to the other jurors, the trial court determined that there had been no prejudice and it was not necessary to voir dire any other jurors. (3T9.)

On direct appeal, the Appellate Division found that "[t]he judge did not mistakenly exercise his discretion in dealing with the agitated juror." (RE13, Appellate Division opinion at 18.)

A criminal defendant has a Fourteenth Amendment due process right to "a tribunal both impartial and mentally competent to afford a hearing." Jordan v. Massachusetts, 225 U.S. 167, 176 (1912).

Although the origins of the rule are not clear, "It is a generally accepted principle of trial administration that jurors must not engage in discussions of a case before they have heard both the evidence and the court's legal instructions and have begun formally deliberating as a collective body." United States v. Resko, 3 F.3d 684, 688-89 (3d Cir. 1993).

> There are a number of reasons for this prohibition on premature deliberations in a criminal case. First,

13

since the prosecution presents its evidence first, any premature discussions are likely to occur before the defendant has a chance to present all of his or her evidence, and it is likely that any initial opinions formed by the jurors, which will likely influence other jurors, will be unfavorable to the defendant for this reason. Second, once a juror expresses his or her views in the presence of other jurors, he or she is likely to continue to adhere to that opinion and to pay greater attention to evidence presented that comports with that opinion. Consequently, the mere act of openly expressing his or her views may tend to cause the juror to approach the case with less than a fully open mind and to adhere to the publicly expressed viewpoint.

Third, the jury system is meant to involve decisionmaking as a collective, deliberative process and premature discussions among individual jurors may thwart that goal. Fourth, because the court provides the jury with legal instructions only after all the evidence has been presented, jurors who engage in premature deliberations do so without the benefit of the court's instructions on the reasonable doubt standard. Fifth, if premature deliberations occur before the defendant has had an opportunity to present all of his or her evidence ... and jurors form premature conclusions about the case, the burden of proof will have been, in effect, shifted from the government to the defendant, who has "the burden of changing by evidence the opinion thus formed."

Finally, requiring the jury to refrain from prematurely discussing the case with fellow jurors in a criminal case helps protect a defendant's Sixth Amendment right to a fair trial as well as his or her due process right to place the burden on the government to prove its case beyond a reasonable doubt.

Resko, 3 F.3d at 689-90 (citations omitted).

When jury misconduct (including improper intra-jury influences) has been alleged mid-trial, the court should: "ascertain whether the misconduct actually occurred; if it did, determine whether it was prejudicial; and if there are no grounds

14

for a new trial, specify the reasons it decided that misconduct did not occur, or occurred but was non-prejudicial." Id. at 691 (citation omitted). "[A]s a practical matter, it is far easier for a ... court to address allegations of jury misconduct when they come to light mid-trial rather than after the verdict has been entered and the jury discharged. Before the jury has been discharged, a ... judge can more readily and more fruitfully explore whether misconduct has in fact occurred and if so, its effect on the jurors. Thus, the balance of practical considerations counseling in favor of further investigation into intra-jury misconduct are much greater when the misconduct is alleged mid-trial rather than post-verdict, when the district court's inquiry will likely be less productive while consuming more time and resources. In addition, at that point, the district court is also in a position to tailor a cautionary instruction to correct the ascertained damage." Id. at 694-95 (footnote omitted). See also, Szuchon v. Lehman, 273 F.3d 299, 313-14 (3d Cir. 2001) (where defendant makes no showing of prejudice based on premature deliberations, "there is no reason to doubt that the jury based its ultimate decision only on evidence formally presented at trial.") (citing Resko).

Here, the decision of the Appellate Division is neither contrary to nor an unreasonable application of the governing federal law. The trial court and both counsel questioned the

15

frightened juror. There is no evidence that she made any
statement to the rest of the jury suggesting that she feared
Petitioner, in particular. Nothing suggests that the
disqualified jurors remarks deprived Petitioner of an impartial
jury. Petitioner is not entitled to relief on this claim.

C.  Admission of Expert Testimony

Petitioner contends that he was deprived of a fair trial by
the court's failure to establish the admissibility and
limitations of the expert's testimony, thereby permitting the
expert to testify that his elemental composition analysis
provided fingerprint type evidence that Petitioner was the killer
and as to matters on which he was not qualified as an expert,
such as the manufacture and distribution of ammunition. The
Supreme Court of New Jersey rejected this claim.

> The primary issue is whether, in the absence of
> statistical probability evidence, the trial court erred
> in admitting expert testimony concerning the similarity
> in composition of lead bullets found at the crime
> scene, in the victim's body, and among defendant's
> belongings. ...

> At the request of the police, Charles Peters, a
> physical scientist with the materials analysis unit of
> the Federal Bureau of Investigation, examined fifteen
> bullets: four collected at the crime scene, two
> recovered from the decedent's body, and the nine Speer
> bullets found among defendant's personal belongings.

> Peters analyzed the bullets using a process known
> as inductively coupled plasma atomic emission
> spectroscopy (ICP). ICP determines the proportions of
> six elements other than lead: copper, antimony,
> bismuth, arsenic, tin, and silver. The bullet
> manufacturer adds these elements to each batch of lead.

16

From one batch to another, the proportions in bullets of the six elements vary. Thus, the chemical composition of a bullet from one batch may match that of another bullet from the same batch, but not the composition of a bullet from another batch.

Peters divided the bullets into five compositional groups. Within each group, the bullets were of the same composition. Four of the five groups contained both a bullet from defendant's pouch and one recovered either from the crime scene or from the victim's body. For example, Group One included six bullets that were analytically indistinguishable: one bullet from the crime scene, one from the victim's body, and four from defendant's pouch. Group Four, which consisted of a solitary bullet found at the crime scene, did not match any other bullets.

At trial, Peters testified that, in his experience and that of his unit, "bullets that come from the same box have the same composition of lead and bullets that come from different boxes ... will have different compositions." He explained that the manufacturer fills a given box with bullets from a single batch of lead. Consequently, those bullets will possess the same chemical composition. Because mixing may occur during storage, however, bullets of different compositions may be found in the same box. Peters concluded that he would not expect random batches of lead to produce the match that existed among the subject bullets.

Before conducting his analysis, Peters had visited the Speer manufacturing plant in Lewiston, Idaho. He limited his testimony on the manufacturing process to an explanation that each bullet is extruded from a "billet," or seventy-pound cylinder of lead. Each batch of lead produces a number of billets. A billet yields approximately 4,300 bullets. About five billion bullets are manufactured in the United States each year, and at least fifty thousand bullets may have the same composition.

The Appellate Division found that the trial court had committed reversible error in allowing Peters to testify, absent foundation evidence of statistical probability, about the identical composition between the bullets recovered from the crime scene and the

17

victim's body and those found in defendant's pouch.   As
the Appellate Division perceived the issue, Peters's
testimony depended on the statistical probability that
the two sets of bullets would have the same
composition.   According to the dissent, however, the
absence of a statistical foundation affected the
weight, not the admissibility, of Peters's testimony.
The dissent pointed out that Peters's testimony was not
that the bullets at the crime scene came from
defendant's bag, but that some of the bullets from the
crime scene and defendant's pouch came from the same
batch.

In addition, the Appellate Division divided on the
issue of the influence exerted by the expert's
testimony.   The majority believed that the expert's
"extensive and impressive credentials" resulted in an
"unwarranted enhancement of probative weight."   The
dissent, by contrast, noted defense counsel's "probing
and able cross-examination of the expert," and
concluded that the expert's testimony "merely added
another link to the chain of evidence[.]"

Historically, statistical evidence has not been a
prerequisite to the admission of matching samples. ...
Similarly, expert testimony about matching soil and
hair samples has been deemed admissible, with the
weight of the evidence left to the jury.   Finally,
expert testimony about matching carpet fibers has been
admitted in the absence of statistical evidence about
the probability of the match.

In Koedatich, a capital case, the State presented
evidence of matching fibers from the defendant's
automobile carpet and seat covers.   The defense
attacked the weight of the evidence by showing that
manufacturers produced hundreds of thousands of yards
of such fibers in a given year.   We upheld the
admission of the evidence of the matching fibers,
observing that the quantity of the fibers went to the
weight, not the admissibility, of the evidence.

Similarly, in the present case, the expert's
testimony established a match among the bullets found
in defendant's belongings, at the crime scene, and in
the victim's body.   Defendant contends that the large
quantity of bullets produced by the manufacturer
renders the match among the bullets inconclusive.   As

18

with the matching fiber samples, however, the
production of a large quantity of comparable samples
affects the weight, not the admissibility, of the
evidence.

. . .

[T]he jury in the present case received the
guidance it needed to discharge its function. The
expert explained the chemistry of lead analysis. He
also explained why bullets of the same chemical
composition generally came from the same box and why a
single box may contain several bullets of different
compositions. Left for the jury was the determination
whether the bullets at issue came from the same box.

...[T]he jury in the present case could evaluate
the expert's testimony without recourse to mathematical
calculations. Like juries assessing samples of blood,
soil, and fibers, the jury here did not require
statistical data to discharge its duties. Peters's
testimony was comparatively straightforward. Contrary
to the Appellate Division, we conclude that his opinion
as an expert was not likely to create an "unwarranted
enhancement of probative weight."

Our conclusion comports with that of courts from
other jurisdictions. For example, the Federal Court of
Appeals for the Eighth Circuit has held that questions
regarding whether bullets come from the same box affect
the weight of the evidence rather than its
admissibility. The Court pointed out that "[v]igorous
cross-examination, presentation of contrary evidence,
and careful instruction on the burden of proof are the
traditional and appropriate means of attacking shaky
but admissible evidence." Similarly, the Supreme
Judicial Court of Massachusetts has allowed an FBI
agent to testify that bullets in the victim's body and
those found on defendant "come from the same box of
ammunition or from different boxes that were
manufactured at the same place on or about the same
date." Finally, the Supreme Court of Oregon permitted
expert testimony that bullets could have come from the
same batch of metal, noting that the defendant's expert
properly pointed out the weaknesses of the evidence.

ICP is an accepted method of bullet lead analysis.
The compositional match among the bullets increased the

probability that the bullets in the victim came from
defendant.  That evidence constituted a link in the
prosecution's chain of evidence.  The defense attempted
to undermine that conclusion by cross-examining the
expert, by showing that many bullets of the same
composition had been manufactured, and by arguing an
alternative conclusion to the jury.  Consequently, we
find that the trial court did not err in permitting
Peters to testify about the similarity of the
composition of the lead bullets.

We also conclude that Peters did not exceed the
limits of his expertise in testifying about the
manufacturing process.  Peters testified that bullets
of the same composition generally come from the same
box, although a single box may contain bullets of
several different compositions.  He based his testimony
on years of analyzing boxes of bullets and on a tour of
the Speer plant.  That tour may not qualify him as an
expert on bullet manufacturing for all purposes.  When
combined with his substantial experience in analyzing
bullets, however, the tour provided him with the
"minimal technical training and knowledge essential to
the expression of a reliable opinion."  Although
experts generally may not express opinions outside
their areas of expertise, those areas may overlap, and
in certain circumstances an expert in one area may be
qualified to express an opinion in another.  Here,
Peters's testimony regarding the arrangement of bullets
in a box provided an appropriate basis for the jury to
evaluate the significance of the bullet matches.

State v. Noel, 157 N.J. 141, 143-150 (1999) (citations omitted).

It is well-established that the violation of a right created

by state law is not cognizable as a basis for federal habeas

relief.  Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("We have

stated many times that 'federal habeas corpus relief does not lie

for errors of state law.'" (quoting Lewis v. Jeffers, 497 U.S.

764, 680 (1990))).  Accordingly, Petitioner cannot obtain relief

for any errors in state law evidentiary rulings, unless they rise

to the level of a deprivation of due process.  Estelle, 502 U.S. at 70 ("'the Due Process Clause guarantees fundamental elements of fairness in a criminal trial'") (quoting Spencer v. Texas, 385 U.S. 554, 563-64 (1967)).

For a habeas petitioner to prevail on a claim that an evidentiary error amounted to a deprivation of due process, he must show that the error was so pervasive as to have denied him a fundamentally fair trial.  Keller v. Larkins, 251 F.3d 408, 413 (3d Cir.), cert. denied, 534 U.S. 973 (2001).

Here, the state court's determination that Peters was a properly-qualified expert on the subjects to which he testified is a factual finding binding on this Court unless rebutted by clear and convincing evidence.  See 28 U.S.C. § 2254(e)(1); Bradshaw v. Richey, 126 S.Ct. 602, 605 (2005).  Petitioner has presented no evidence to suggest that Peters was not a qualified expert.  The conclusion of the Supreme Court of New Jersey that the admission of the expert testimony did not deprive Petitioner of a fair trial is neither contrary to nor an unreasonable application of the governing federal law.  The expert's testimony was limited and straightforward.  Defense counsel properly elicited testimony explaining the total number of bullets in a batch to limit the effect of the evidence of matching samples. Petitioner is not entitled to relief on this claim.

21

D.   Jury Instructions

Generally, a jury instruction that is inconsistent with state law does not merit federal habeas relief.  Where a federal habeas petitioner challenges jury instructions given in a state criminal proceeding,

> [t]he only question for us is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."  It is well established that the instruction "may not be judged in artificial isolation," but must be considered in the context of the instructions as a whole and the trial record.  In addition, in reviewing an ambiguous instruction ..., we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.  And we also bear in mind our previous admonition that we "have defined the category of infractions that violate 'fundamental fairness' very narrowly."  "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation."

Estelle v. McGuire, 502 U.S. 62, 72-73 (1991) (citations omitted).  Thus, the Due Process Clause is violated only where "the erroneous instructions have operated to lift the burden of proof on an essential element of an offense as defined by state law."  Smith v. Horn, 120 F.3d 400, 416 (1997).  See also In re Winship, 397 U.S. 358, 364 (1970) ("the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged"); Sandstrom v. Montana, 442 U.S. 510, 523 (1979) (jury instructions that suggest a jury may convict without proving each element of a crime beyond a

22

reasonable doubt violate the constitutional rights of the accused).

Where such a constitutional error has occurred, it generally is subject to "harmless error" analysis. <u>Smith v. Horn</u>, 120 F.3d at 416-17; <u>Neder v. United States</u>, 527 U.S. 1, 8-11 (1999). "[I]f the [federal habeas] court concludes from the record that the error had a 'substantial and injurious effect or influence' on the verdict, or if it is in 'grave doubt' whether that is so, the error cannot be deemed harmless." <u>Id.</u> at 418 (citing <u>California v. Roy</u>, 519 U.S. 2, 5 (1996)). In evaluating a challenged instruction,

> a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge. If the charge as a whole is ambiguous, the question is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution.

<u>Middleton v. McNeil</u>, 541 U.S. 433, 437 (2004) (internal quotations and citations omitted).

    1.   <u>Reasonable Doubt</u>

Petitioner contends that the jury instruction on reasonable doubt was flawed because, while it required the jury to find each element of the offense beyond a reasonable doubt, it permitted the jury to find facts and inferences by a preponderance standard. Petitioner contends that the effect of the instruction was to lessen the burden of proof.

23

The trial court gave the following charge as to the burden of proof.

> This defendant Judel Noel, as are all defendants in criminal cases, is presumed to be innocent until proven guilty beyond a reasonable doubt. That presumption of innocence continues throughout the whole trial of the case, and even during your deliberations, unless and until you have determined that the state has proven his guilt of a charge beyond a reasonable doubt.
>
> The burden of proving a defendant guilty of a crime, a criminal charge is on the state and it never shifts. It remains on the state throughout the whole trial of the case. No burden with respect to proof is placed on the defendant. It is not his job to prove his innocence. Until the state has proven the crime charged and each of its elements beyond a reasonable doubt, a defendant is entitled to an acquittal on such charge.
>
> By reasonable doubt we don't mean a mere possible or imaginary doubt because, as you may well know, everything relating to human affairs or depending upon oral evidence is open to have some possible or imaginary doubt.
>
> A reasonable doubt is in an honest and reasonable uncertainty as to the guilt of the defendant existing in your minds after you have given full and impartial consideration to all of the evidence.
>
> It may arise from evidence or from lack of evidence. You may find that a fact exists and you may draw an inference from a fact whenever it is more probable than not that the fact or inference is true.
>
> The existence of each fact and the truth of each inference need not be established beyond a reasonable doubt in order for you to find the fact or to draw the inference. But to convict, you must be satisfied that each element of the offense has been proved beyond a reasonable doubt.

(4T83-84 (emphasis added).)

24

On direct appeal, the Appellate Division found that "the reasonable doubt charge, read in context, was entirely correct." (RE13, Appellate Division opinion at 18.)

A jury instruction that "reduce[s] the level of proof necessary for the Government to carry its burden [of proof beyond a reasonable doubt] is plainly inconsistent with the constitutionally rooted presumption of innocence." Cool v. United States, 409 U.S. 100, 104 (1972). "[T]rial courts must avoid defining reasonable doubt so as to lead the jury to convict on a lesser showing than due process requires." Victor v. Nebraska, 511 U.S. 1, 22 (1994); see also Cage v. Louisiana, 498 U.S. 39, 41 (1990). As the Supreme Court explained in Victor,

> so long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof. Rather, taken as a whole, the instructions [must] correctly conve[y] the concept of reasonable doubt to the jury.

Victor, 511 U.S. at 6 (citations and internal quotation marks omitted.

"[A] misdescription of the burden of proof ... vitiates all the jury's findings. Sullivan v. Louisiana, 508 U.S. 275, 281 (1993) (emphasis in original). Such an error is considered structural and thus is not subject to harmless error review. See id. at 280-82. But see Neder v. United States, 527 U.S. 1, 8-11

(1999) (applying harmless-error analysis where jury was not instructed on an element of an offense).

The determination of the Appellate Division that the challenged instruction did not unconstitutionally shift the burden of proof is neither contrary to nor an unreasonable application of governing federal law. See, e.g., Brown v. Folino, 2006 WL 1232881 (3d Cir. May 9, 2006) (unpubl.) (noting that in only one case, involving a definition dissimilar to that challenged here, has the Supreme Court held that a definition of reasonable doubt violated due process); Manning v. Hendricks, 2005 WL 3406438 (D.N.J. Dec. 12, 2005) (unpubl.) (denying relief with respect to an instruction virtually identical to that challenged here). Moreover, in evaluating the constitutionality of statutory permissive inferences, the Supreme Court has not required that such inferences satisfy the reasonable-doubt standard. See, e.g., County Court of Ulster County v. Allen, 442 U.S. 140 (1979); Leary v. United States, 395 U.S. 6 (1969). Thus, Petitioner is not entitled to relief on this claim.

2.   Aggravated Manslaughter

Petitioner contends that he was deprived of a fair trial by the trial court's refusal to include a charge on aggravated manslaughter as a lesser-included offense of murder.[3]  Under New

---

[3] Respondents contend that this claim is unexhausted.  This issue clearly was raised and rejected by the Appellate Division on direct appeal.  Although the record submitted to this Court

26

Jersey law, criminal homicide constitutes aggravated manslaughter
when "[t]he actor recklessly causes death under circumstances
manifesting extreme indifference to human life."  N.J.S.A. 2C:11-
4a(1).  Petitioner argues that the jury could have found that he
committed aggravated manslaughter by firing shots into the front
of the house as part of a scare tactic.

On direct appeal, the Appellate Division found that "there
was no reasonable basis in the record to charge aggravated
manslaughter.  This was an assassination."  (RE13; Appellate
Division opinion at 18.)

In Beck v. Alabama, 447 U.S. 625, 635 (1980), the Supreme
Court held that, in a capital case, a trial court must give a
requested charge on a lesser included offense where it is
supported by the evidence.  The Court left open the question of
whether instructions on lesser included offenses were required in
non-capital cases.  Id.  The Court of Appeals for the Third
Circuit has held that trial courts must charge a lesser included
offense so that the jury does not convict a defendant of a crime
more serious than the jury believes the defendant actually
committed merely because the jury believes the defendant had some

_____

does not include Petitioner's petition for certification on
direct appeal, the statement of Procedural History contained in
Petitioner's Brief on direct appeal before the Supreme Court of
New Jersey reflects that Petitioner filed a petition for
certification as to this claim and all others summarily denied by
the Appellate Division and that the Supreme Court of New Jersey
denied certification.  Thus, this claim is exhausted.

27

degree of involvement and does not want to set the defendant free.  Vujosevic v. Rafferty, 844 F.2d 1023, 1027 (3d Cir. 1988) (citing Keeble v. United States, 412 U.S. 205, 212-13 (1973)).  But see Geschwendt v. Ryan, 967 F.2d 877, 884 n.13 (3d Cir.) (observing that the Supreme Court, in Schad v. Arizona, 501 U.S. 624 (1991), cast doubt on the theory that due process requires the court to instruct on a lesser included offense in non-capital offenses), cert. denied, 506 U.S. 977 (1992).  Other circuits have held that the failure to give lesser included offense instructions in a non-capital case does not present a constitutional question.  See Pitts v. Lockhart, 911 F.2d 109, 112 (8th Cir. 1990), cert. denied, 501 U.S. 1253 (1991); Bonner v. Henderson, 517 F.2d 135, 136 (5th Cir. 1975).

Under New Jersey law, an instruction as to a lesser offense is warranted where the facts provide a rational basis for such a conviction.  N.J.S.A. 2C:1-8e ("the court shall not charge the jury with respect to a lesser included offense unless there is a rational basis for a verdict convicting the defendant of the lesser included offense"); State v. Choice, 98 N.J. 295, 298-99 (1985).  However, a charge on a lesser included offense should not be given where it would invite the jury to engage in sheer speculation.  State v. Mendez, 252 N.J. Super. 155, 159 (App. Div. 1991), certif. denied, 127 N.J. 560 (1992).

28

This Court observes that the states are free to define criminal offenses in any way they see fit, within certain constitutional limitations, even through their lower courts. Smith v. Horn, 120 F.3d 400, 415 (1997) (citing Johnson v. Rosemeyer, 117 F.3d 104 (3d Cir. 1997)), cert. denied, 522 U.S. 1109 (1998). Here, state law defines aggravated manslaughter as a homicide in which the actor "recklessly" causes death "under circumstances manifesting extreme indifference to human life." The state courts found that the evidence could not support a verdict of aggravated manslaughter under this definition. The trial court noted that the shots were fired in close proximity to the victim and that 4 or 5 of the 8 to 10 shots fired went into the victim's body. The Appellate Division called the homicide an "assassination." This Court is bound by the Appellate Division's conclusions as to state law. Cf. Kontakis v. Beyer, 19 F.3d 110, 119 (3d Cir.), cert. denied, 513 U.S. 881 (1994) (habeas relief not to be granted when state court has determined that charge on lesser included offense is not supported in the evidence). As the refusal to charge the jury on aggravated manslaughter conformed to state law, Petitioner was not thereby deprived of due process. Petitioner is not entitled to relief on this claim.

E.    Identification

Petitioner contends that the out-of-court identification by witness Lamar Brown was impermissibly suggestive, because it

resulted from a police beating, and that the trial court should have conducted a <u>Wade</u>[4] hearing to determinate the admissibility of the identification of Petitioner.[5]

An accused is entitled to due process protection against the introduction of evidence of, or tainted by, unreliable identifications elicited through unnecessarily suggestive identification procedures.  <u>See generally</u> <u>Manson v. Brathwaite</u>, 432 U.S. 98 (1977) and cases cited therein.

> [R]eliability is the linchpin in determining the admissibility of identification testimony ... .  The factors to be considered ... include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.  Against these factors is to be weighed the corrupting effect of the suggestive identification itself.

<u>Manson</u>, 432 U.S. at 114.  <u>See also</u> <u>Simmons v. United States</u>, 390 U.S. 377 (1968) (due process prohibits in-court identification if pre-trial identification procedure is "so impermissibly

_____

[4] <u>United States v. Wade</u>, 388 U.S. 218 (1967) (where an accused was not represented by counsel in post-indictment line-up identification procedure, accused is entitled to hearing to determine whether identification procedure was so tainted that in-court identification should be suppressed).

[5] Respondents contend that this claim was never raised in state court.  This claim was raised in Petitioner's state petition for post-conviction relief.  (Pet. ¶ 11.)  It does not appear that the claim was pursued on appeal of the denial of post-conviction relief.  Thus, it is unexhausted.  This Court will exercise its discretion to deny relief pursuant to 28 U.S.C. § 2254(b)(2).

suggestive as to give rise to a very substantial likelihood of irreparable misidentification").

Here, there is no dispute that the witness Lamar Brown knew Petitioner at the time of his statement to police. There was no basis for a Wade hearing to determine whether the identification was tainted. To the extent there was evidence that police brutality caused Brown to identify Petitioner, that evidence came to light only when Brown recanted his identification. The identification was proper under Wade and both the identification and the evidence casting doubt on the reliability of the identification were properly put before the jury. Petitioner is not entitled to relief on this claim.

F.  Ineffective Assistance of Trial Counsel

The Counsel Clause of the Sixth Amendment provides that a criminal defendant "shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The right to counsel is "the right to effective assistance of counsel." McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970) (emphasis added).

To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must show both that his counsel's performance fell below an objective standard of reasonable professional assistance and that there is a reasonable probability that, but for counsel's unprofessional errors, the outcome would have been

different.  Strickland v. Washington, 466 U.S. 668, 687, 694
(1984).  A "reasonable probability" is "a probability sufficient
to undermine confidence in the outcome."  Strickland at 694.
Counsel's errors must have been "so serious as to deprive the
defendant of a fair trial, a trial whose result is reliable."
Id. at 687.  "When a defendant challenges a conviction, the
question is whether there is a reasonable probability that,
absent the errors, the factfinder would have had a reasonable
doubt respecting guilt."  Id. at 695.

The performance and prejudice prongs of Strickland may be
addressed in either order, and "[i]f it is easier to dispose of
an ineffectiveness claim on the ground of lack of sufficient
prejudice ... that course should be followed."  Id. at 697.

There is "a strong presumption that counsel's conduct falls
within the wide range of reasonable professional assistance."
Strickland, 466 U.S. at 689.  As a general matter, strategic
choices made by counsel after a thorough investigation of the
facts and law are "virtually unchallengeable," though strategic
choices "made after less than complete investigation are
reasonable precisely to the extent that reasonable professional
judgments support the limitations on investigation."  Id. at 690-
91.  If counsel has been deficient in any way, however, the
habeas court must determine whether the cumulative effect of
counsel's errors prejudiced the defendant within the meaning of

32

Strickland.  See Berryman v. Morton, 100 F.3d 1089, 1101-02 (3d

Cir. 1996).

### 1.  Expert Testimony

Petitioner contends that he was denied the effective

assistance of counsel in that counsel failed properly to

investigate the background and qualifications of the State's

expert[6] and failed to retain the services of an expert to refute

the testimony of the State's witness regarding bullet lead

composition.

The PCR court denied Petitioner an evidentiary hearing on

this claim because Petitioner had failed to present any evidence

that, at the time of trial, an appropriate expert was available

to defense counsel to refute the testimony of the prosecution

expert.  The denial of relief was without prejudice, to reopen if

Petitioner could provide that evidence.  Petitioner did not

attempt to reopen the matter, but instead appealed, asserting

that the PCR court should have granted him an evidentiary

hearing.

---

[6] Respondents correctly argue that the claim as to the
expert's credentials was not exhausted at the appellate level.
(RE5, Brief on Behalf of Defendant-Appellant at 19 ("The issue is
not the expert's background and qualifications.  He is a physical
scientist who has worked for the Federal Bureau of Investigation
for nearly seventeen years and was its chief chemist in bullet
and lead analysis.").)  This Court will exercise its discretion
to deny relief pursuant to 28 U.S.C. § 2254(b)(2).

The state courts have found that the expert was qualified to testify as he did. Petitioner has failed to present any evidence that a qualified expert was available, at the time of trial, to refute the evidence of the prosecution expert. Petitioner has failed to explain what evidence could have been presented that would have created a reasonable probability that the outcome would have been different. Petitioner has failed to establish either the performance or prejudice prongs of the Strickland test, and he is not entitled to relief on this claim.

### 2.   Failure to present exculpatory witnesses

Petitioner contends that his trial counsel should have investigated and presented exculpatory witnesses able to confirm (a) the testimony of Lamar Brown that he was not in his home at the time of the offense, thus confirming his recantation testimony that his earlier identification of Petitioner as the offender was false, and (b) the testimony of Kenya Cannonier that identifying witness Malika Williams was not telling the truth when she testified that she was outside at the time of the offense and saw Petitioner shoot the victim.[7]  Petitioner does

---

[7] This claim was raised in Petitioner's state court petition for post-conviction relief. (Pet. ¶ 11.)  Respondents argue that this claim is unexhausted. In his brief on appeal, Petitioner argued that the trial court erred in denying him an evidentiary hearing on the ineffective assistance claim. (RE5.)  Petitioner relied on multiple errors, including counsel's alleged failure to call alibi witnesses. In his petition for certification, Petitioner relied on the arguments presented in his Appellate Division brief. (RE2.)  While the arguments contained in the

34

not identify these witnesses by name.   The testimony at trial does identify the persons alleged to have been with Lamar Brown, Kenya Cannonier, and Malika Williams at the time of the offense, and it appears that these are the witnesses Petitioner contends should have been called.

In rejecting this claim, the PCR court noted that Petitioner had failed to present any affidavits or any other "suggestions" that if certain persons had been interviewed they would have testified favorably.

A review of the trial record suggests that, with respect to at least two of these witnesses, the failure to call them as defense witnesses was a strategic decision.   Tameka Williams was present at trial on March 20, 1996, but was not called to testify.   (RE18 at 133-135.)   Another witness, Hanifa Blunt, was present on March 21, 1996, but the record reflects that counsel recommended that she not be called to testify and that Petitioner concurred with that assessment.   (RE19 at 3.)   Other witnesses were supposed to be present, but did not appear.   (RE18 at 134.) Petitioner has failed to present any evidence of inadequate investigation.   Nor has Petitioner presented any affidavits as to the testimony the uncalled witnesses would have provided had they

---

Appellate Division brief are not factually specific, it appears that this claim is exhausted.   To the extent it is not exhausted, this Court will exercise its discretion to deny relief under 28 U.S.C. § 2254(b)(2).

testified.  To the extent they would have testified that the
eyewitnesses Malika Williams and Lamar Brown were not in the area
at the time the offense was committed, that evidence was already
presented to the jury through other witnesses.  Thus, Petitioner
has failed to demonstrate that there is a reasonable probability
that the outcome would have been different had these witnesses
testified.  Petitioner has failed to establish either the
performance or prejudice prongs of the Strickland standard.
Petitioner is not entitled to relief on this claim.

G.   Prosecutorial Misconduct

Petitioner contends that his due process rights were
violated by the prosecutor's comments in summation suggesting a
level of scientific certainty about the bullet lead composition
that was not supported by the expert testimony.  The Supreme
Court of New Jersey rejected this argument on direct appeal.

> According to the dissent, "[t]he problem in the case is
> not with what the expert testified to, but with what
> the State has attempted to do with his testimony." ...
>
> In particular, the dissent highlights three
> statements from the State's summation:
>
>> It is a very precise scientific process...
>> ...
>> You could almost see [Peters] in a white lab
>> coat.  You could almost see him in math class
>> in high school in the back.  He had all the
>> answers.  He's a straight shooter....
>> ...
>> The key ... is the number of sources of lead;
>> the number of batches.  Millions of batches;
>> each one unique like a snow flake, like a
>> fingerprint.

At trial, defendant did not object to the first
two statements.  Not even in the Appellate Division did
he challenge them.  In overruling defendant's objection
in the prosecutor's final statement to the analogy
between snowflakes and bullets, the trial court
characterized the statement as a "metaphor."

In his own closing argument, defense counsel,
apparently anticipating the prosecutor's summation,
argued that many boxes contain bullets matching the
ones at issue.  That argument directed the jury's
attention to the issue that concerns the dissent,
"whether too many bullets were in circulation to
justify any conclusive inference of guilt."  During the
course of the trial, moreover, defense counsel
vigorously cross-examined Peters.  Finally, nothing
prevented defense counsel from introducing evidence
contradicting Peters's testimony or from requesting a
charge on the jury's use of that testimony if it found
the evidence to be unreliable or misleading.

. . .

Excessive statements from both sides are a
regrettable fact of life in criminal trials.  In such
trials, an objection by counsel remains as the first
line of defense.  Although the prosecutor's statement
may have been more temperate, it, particularly in the
absence of an objection, does not justify upsetting the
jury verdict.  Given the realities of adversary
proceedings, the prosecutor's remarks pass as fair
comment.

State v. Noel, 157 N.J. at 151-52 (citations omitted).

The U.S. Supreme Court has recognized the obligation of a

prosecutor to conduct a criminal prosecution with propriety and

fairness.

He may prosecute with earnestness and vigor - indeed,
he should do so.  But, while he may strike hard blows,
he is not at liberty to strike foul ones.  It is as
much his duty to refrain from improper methods
calculated to produce a wrongful conviction as it is to
use every legitimate means to bring about a just one.

37

> ... Consequently, improper suggestions, insinuations,
> and, especially, assertions of personal knowledge are
> apt to carry much weight against the accused when they
> should properly carry none.

Berger v. United States, 295 U.S. 78, 88 (1935).  "The line

separating acceptable from improper advocacy is not easily drawn;

there is often a gray zone.  Prosecutors sometime breach their

duty to refrain from overzealous conduct by commenting on the

defendant's guilt and offering unsolicited personal views on the

evidence."  United States v. Young, 470 U.S. 1, 7 (1985).

> The prosecutor's vouching for the credibility of
> witnesses and expressing his personal opinion
> concerning the guilt of the accused pose two dangers:
> such comments can convey the impression that evidence
> not presented to the jury, but known to the prosecutor,
> supports the charges against the defendant and can thus
> jeopardize the defendant's right to be tried solely on
> the basis of the evidence presented to the jury; and
> the prosecutor's opinion carries with it the imprimatur
> of the Government and may induce the jury to trust the
> Government's judgment rather than its own view of the
> evidence.

Id. at 18.

Under U.S. Supreme Court precedent, where a prosecutor's

opening or closing remarks are challenged in habeas, "[t]he

relevant question is whether the prosecutor's comments 'so

infected the trial with unfairness as to make the resulting

conviction a denial of due process.'"  Darden v. Wainwright, 477

U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S.

637 (1974)).  In evaluating the likely effect of improper

comments, a court may consider whether the improper comments were

38

invited by or responsive to prior comments by opposing counsel. Darden, 477 U.S. at 181-82. Thus, "Supreme Court precedent counsels that the reviewing court must examine the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." Moore v. Morton, 255 F.3d 95, 107 (3d Cir. 2001).

Here, the Supreme Court of New Jersey evaluated the prosecutor's comments in light of the entire trial, including defense counsel's summation. The conclusion of the Supreme Court of New Jersey that the prosecutor's remarks pass as "fair comment" is neither contrary to nor an unreasonable application of governing federal law. Petitioner is not entitled to relief on this claim.

### IV.   CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate

to deserve encouragement to proceed further." <u>Miller-El v.</u>
<u>Cockrell</u>, 537 U.S. 322, 327 (2003).

Here, Petitioner has failed to make a substantial showing of
the denial of a constitutional right.  No certificate of
appealability shall issue.

### V.   CONCLUSION

For the reasons set forth above, the Petition must be
denied.  An appropriate order follows.


William H. Walls
United States District Judge

Dated: 19 June 2006

40